IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Tammy Jones, | Case No. 3:12 CV 3046 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | |
| | JUDGE JACK ZOUHARY |
| Elmwood Centers Inc., | |
| Defendant. | |

### INTRODUCTION

This is an employment case in which Defendant Elmwood Centers, Inc.[1] terminated Plaintiff Tammy Jones while she was on medical leave for her pregnancy. Plaintiff brings claims under the Family Medical Leave Act ("FMLA"), Title VII, and Ohio's discrimination statute, R.C. § 4112.02. Pending before this Court is Defendant's Motion for Summary Judgment (Doc. 48), Plaintiff's Opposition (Doc. 50), and Defendant's Reply (Doc. 52). This Court held a record hearing on the pending Motion and indicated it would grant in part and deny in part the Motion (Doc. 63). This Memorandum Opinion supplements this Court's bench ruling.

### BACKGROUND

Defendant operates residential group homes in northern Ohio for individuals with a wide range of mental and developmental disabilities. While some residents are relatively independent, others are

---

[1] Plaintiff also sued Defendants Elmwood Communities and Elmwood Management Ltd., but during the record hearing, Plaintiff agreed to dismiss these Defendants (Doc. 63).

wheelchair bound, unable to ambulate, or have behavioral problems that render them completely dependent on others (Doc. 40, Jones Dep. at 26).  The company is owned by CEO Kathy Hunt (Doc. 41, Hunt Dep. I at 8–9).  Defendant hired Plaintiff, a licensed practical nurse, in April 2010.  That May, Defendant promoted Plaintiff to the position of Health Services Coordinator ("HSC").  As HSC, Plaintiff was responsible for about 24 residents located in four of Defendant's homes in Green Springs, Ohio (Jones Dep. at 25).  Residents were placed in different homes depending on their individual needs (*id.*).  The four homes are in close proximity to one another and arranged in a circle (*id.* at 26).

The HSC's duties included evaluating residents' medical needs and scheduling their medical appointments, dispensing medication, supervising "med pass" nurses (LPNs who dispense medications to residents), and working with others to write "med pass goals" for each resident -- physical goals for each resident to achieve (*see* Doc. 51-4, Orientation Checklist; Hunt Dep. I at 99).  The HSC is responsible for ensuring a doctor completes a "health and physical" report annually for each resident (Doc. 43, Warwick Dep. I at 39).  The HSC is also responsible for administering necessary tuberculosis testing for staff and residents (Doc. 45, Linkey Dep. at 182; Doc. 51-4 at 1).

Plaintiff's immediate supervisor was Kim Warwick, the executive director (Warwick Dep. I at 26).  Warwick assumed that position around September 2010 (*id.* at 11), and reported directly to Hunt (Hunt Dep. I at 11).  Warwick is not a medical professional and has not received any formal education beyond high school (Warwick Dep. at 14).  She shared an office with Plaintiff; their desks close to one another (Jones Dep. at 57–58).

**Plaintiff's Performance Review**

In September 2010, Warwick issued Plaintiff a written disciplinary "counseling session" for excessive cell phone use (Doc. 51-11, Discussion Summary).  The form read: "Throughout the past

2

week I have observed you to be using your cell phone a lot, please keep in mind that personal calls should be made during your break and should be kept to a minimum. All future incidents will result in further discipline." This is the only written counseling or reprimand Plaintiff received prior to her July 2011 termination.

Warwick completed a performance review for Plaintiff in November 2010 (Jones Dep. at 60). Out of seven categories, Plaintiff received a rating of "above average" in five categories and "average" in two (Doc. 50-15, Evaluation). And, overall, Warwick rated Plaintiff "above average" with a score of 74 out of 100 possible points (*id.*). This is the only evaluation completed during Plaintiff's employment with Defendant. Warwick gave Plaintiff the following narrative evaluation:

> Strengths: Tammy, It has been a pleasure having you here at Elmwood's Group Homes. You seem to be well liked and respected by the staff and you seem to have a good/open line of communication with your Med Pass Nurses. It is appreciated that you seem to be on top of the resident's health issues and seem to have gotten the many job duties of your HSC position down pat. I greatly appreciate your assistance and your ideas when it comes to motivating/encouraging the staff.
>
> Goals: In the coming year please continue to work on getting to know all the Elmwood[] policies and procedure as these are a great learning tool in better assisting you in learning your job. Please continue to remember to keep personal calls to a minimum during work . . .you have been doing well lately. Continue to ensure that labs/appointments are kept up to date and that paperwork is all in order. Keep up the great work and let's do a great job with our Licensure and ODH surveys[.]

(Doc. 50-15 at 2)

**Plaintiff Takes Pregnancy Leave**

By early 2011, Plaintiff had informed Defendant she was pregnant. Plaintiff went on emergency FMLA leave on June 17 when her doctor placed her on bed rest due to pregnancy complications (Jones Dep. at 33; Doc. 51-1, FMLA Request Form). She remained on leave into July. At some point, Plaintiff called Warwick to inform her that her C-section had been delayed until

August 8, 2011, extending her medical leave (Jones Dep. at 80). Plaintiff testified that during this conversation, Warwick mentioned this extension would prevent Warwick from taking a previously scheduled vacation the first two weeks of August (*id.* at 82–83). About a week after that conversation, Plaintiff was asked to return her company-issued cell phone (*id.* at 80). Two days after she returned the phone, on July 22, 2011, Kathy Hunt called Plaintiff at home and terminated her employment (*id.*).

While on leave, Stacy Fiser Linkey, a med pass nurse, filled Plaintiff's position as HSC (Warwick Dep. I at 45). Linkey brought to Warwick's attention irregularities with resident medical paperwork (*id.* at 46–47). Linkey discovered more and more issues over the course of a few weeks (*id.* at 49). At the instruction of Warwick or Hunt, Linkey began documenting these problems (Linkey Dep. at 50). Two other former HSCs were brought in to assist Linkey in performing an audit of resident medical records (*id.*).

**Reasons Given for Plaintiff's Termination**

According to Hunt, the discoveries by Linkey and others precipitated Plaintiff's termination mid-FMLA leave. The July 22, 2011 termination summary (which Hunt read to Plaintiff over the phone) listed the following reasons for Plaintiff's termination:

- Missing documentation, you were neglectful in completing Annual H[ealth] & P[hysicals] and failed to schedule routine appointments which could affect resident health.

- Dietician reported to me in June that filing was not up to date in charts, I then discussed this issue with you prior to your leave, you assured me at that time that filing was up to date, upon your leave it was discovered that filing was not up to date since March.

- Failed to follow up on wheelchair order for a resident dated by physician 5/26/11, resident did not receive wheelchair evaluation until 7/14/11.

- Failed to complete New Hire training in a timely manner.

4

- Excessive cell phone use in regards to personal use on a company cell phone.

(Doc. 50-10, 7/22/11 Summary). Following an application process, Linkey was hired to replace Plaintiff as HSC (Linkey Dep. at 13).

According to Warwick, at least one resident missed an appointment with her primary care physician because Plaintiff failed to schedule a follow up visit (Warwick Dep. I at 43). Warwick and Linkey discovered that Plaintiff was not using an "appointment tracker" form developed by a prior HSC (*id.* at 88–90). Use of the appointment tracker form is a sticking point in this case. Plaintiff testified she was never told to use the appointment tracker (Jones Dep. at 41; Doc. 50-1, Jones Aff. at ¶19). Instead, Plaintiff kept track of resident medical appointments on her desk calendar (Jones Dep. at 57). Plaintiff kept the calendar on her desk while she was at the office but would file it in a cabinet when she left each day (*id.* at 58). No one other than Plaintiff made entries on the calendar (*id.* at 58–59).

Defendant cites to Linkey's list of additional missed appointments or failures to document annual medical reports (Doc. 50-2). In particular, Defendant identifies the following issues in its Motion (Doc. 48 at 12–13):

- SW and BB had no documentation of having a timely health and physical exam, which are required annually.

- SD had no record of a PAP test for two years, which Defendant requires annually. Linkey called SD's physician and confirmed that SD was fine only having a PAP test every two years (Linkey Dep. II at 286).

- MC had not had a mammogram for over a year, which Defendant requires annually.

- EN no record of PAP test since March 2009. Linkey contacted EN's physician and the physician "permanently deferred" EN's PAP test "due to normal PAP's in the past and age" (Linkey Dep. II at 299–300).

- BN, who has seizures, had not seen the neurologist in over eight months. Defendant contends BN was required to see the neurologist every six months.

5

- There exists no documentation of MH having a visit with her primary care physician from December 2010 until July 2011.

- JL did not have a med-pass goal re-implemented.

Defendant contends the HSC also is responsible for completing nursing-related training for all new hires (Doc. 48 at 13). Linkey reported that training for six new hires had not yet been completed and tuberculosis follow-up testing had not been completed for two new hires (Linkey Dep. at 173–74, 177, 182). Plaintiff contends she was not responsible for ensuring newly hired residential training staff ("RTS') completed training; she was only responsible for ensuring the med pass nurses were sufficiently trained (Jones Aff. ¶¶ 5–6). She also disputes that the two TB follow-ups were her responsibility, arguing it is the responsibility of the human resources director (*id.* at ¶¶ 7–11; Jones Dep. at 54–55). As HSC, Plaintiff contends she was only responsible for administering and reading the tests (Jones Dep. at 55).

Defendant did not have a formal policy in place that required use of the appointment tracker (Warwick Dep. I at 93). Warwick testified that she had a conversation with Plaintiff about using the appointment tracker form for residents (*id.* at 95). Hunt testified that using the appointment tracker is mandatory (Hunt Dep. I at 136). Plaintiff was trained by her predecessor, April Clay Conrad, and contends that Conrad never informed her that she was required to use the appointment tracker (Jones Aff. ¶ 19). In fact, Plaintiff contends Conrad told her to use the desk calendar method (*id.*).

When it came to keeping charts up to date, Plaintiff testified she filed documents monthly (Jones Dep. at 59). So, when she left for medical leave on June 17, she had not filed any documents for the month of June (*id.* at 59–60). The filings included documents the dietician needed to review for each resident (Warwick Dep. I at 118). Plaintiff usually would scurry to file the documents right

6

before the dietician arrived (*id.* at 119). The dietician had complained Plaintiff was not filing documents in a timely manner (Hunt Dep. I at 65).

Hunt made the final decision to terminate Plaintiff based on Warwick's recommendation and reports about Plaintiff's poor work (Hunt Dep. I at 47). Hunt investigated Warwick's allegations by speaking with the dietician, Linkey, and possibly other nurses (*id.* at 51–52). Hunt did not examine the medical files involved in Plaintiff's alleged mistakes (*id.* at 54).

Defendant had previously accommodated Plaintiff's medical restrictions. Around June 2010, Plaintiff broke her left foot (Jones Dep. at 23). She missed one day of work and performed her job with the assistance of a wheelchair (*id.*). In January 2011, in connection with her pregnancy, Plaintiff's doctor ordered that she not lift more than ten pounds (*id.* at 24–25). Defendant accommodated this need. Finally, in June 2011, again due to her pregnancy, Plaintiff was placed on light duty restrictions with no prolonged standing (*id.*).

## SUMMARY JUDGMENT STANDARD

Pursuant to Federal Civil Rule 56(a), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

**DISCUSSION**

**FMLA Retaliation**

The FMLA entitles qualifying employees to take up to twelve weeks of unpaid leave, without fear of termination, when the leave is taken for a serious health condition. 29 U.S.C. §§ 2612(a)(1)(D) & 2614(a)(1). Plaintiff contends her discharge was in retaliation for taking FMLA leave. To establish a prima facie case of FMLA retaliation, Plaintiff must show: (1) she was engaged in an activity protected by the FMLA; (2) her employer knew she was exercising her FMLA rights; (3) after learning of her exercise of FMLA rights, the employer took an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Killiam v. Yorozu Auto. Tenn.*, 454 F.3d 549, 556 (6th Cir. 2006). Defendant does not dispute the first three elements. Defendant also acknowledges that the Sixth Circuit has held that temporal proximity alone can, in certain circumstances, suffice to establish the fourth element. *See DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004). Here, Defendant terminated Plaintiff during her FMLA leave and Plaintiff testified Warwick complained that Plaintiff's leave would interfere with Warwick's vacation. These facts are sufficient to establish a causal connection. *See id.*

Defendant offers the following legitimate, non-discriminatory reasons for terminating Plaintiff: Plaintiff failed to follow Defendant's policies and procedures; she failed to use the appointment tracker forms; and she failed to ensure employee training and testing were up to date (*see* Doc. 48 at 16–18). Plaintiff contends Defendant's reasons are pretext because they have no basis in fact or were not the real reasons for her termination (Doc. 50 at 38). *See Manzer v. Diamond Shamrock Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

In this case, there are several factual disputes surrounding the validity of the reasons offered by Defendant for terminating Plaintiff. Plaintiff, trained by her predecessor, Conrad, contends that

8

Conrad never informed her that she was required to use the appointment tracker (Jones Aff. ¶ 19). Plaintiff further contends Conrad told her to use the desk calendar (*id.*). Defendant claims the appointment tracker form was required policy (Doc. 51-2), but it does not cite this Court to a written policy instructing the HSC to use the form. Additionally, this Court notes that Warwick and others were aware that Plaintiff used the desk calendar system to track appointments, and Defendant never reprimanded Plaintiff for using this method.

There are also disputed issues of fact surrounding residents' missed appointments and where the fault for those missed appointments lies. Plaintiff argues some of the appointments were not documented by the prior HSC, not her. For example, EN had no record of PAP test since March 2009. Plaintiff was not HSC in March 2009, and it is unclear who was responsible for documenting that EN's physician ordered that EN did not need an annual PAP exam. Plaintiff also contends the physician is ultimately responsible for completing the health and physical reports, and that late appointments were caused by physicians not timely filling out and returning the reports (*see* Jones Aff. ¶ 12). Similar disputes exist as to whether Plaintiff was responsible for following up with employees to ensure their TB testing was complete. Defendant's own policy suggests the human resources director was responsible for TB shots and testing (Doc. 50-4). Finally, there are factual disputes about whether Plaintiff was responsible for training RTS employees (Jones Aff. ¶¶ 4–6, 11) (Plaintiff "did not regularly train . . . but would "[o]n occasion . . . train the RTS personnel as a group on a new machine.")

In light of these factual disputes, Defendant's summary judgment motion is well-taken on this claim only if Defendant establishes it held an "honest belief" in the factual basis for terminating Plaintiff. "A plaintiff is required to show 'more than a dispute over the facts upon which the discharge was based.'" *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting

9

*Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). The Sixth Circuit has held that "the ground rules for application of the honest belief rule are clear." *Id.* It is not required that the employer's decision-making process under scrutiny "be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)).

Defendant's ultimate decisionmaker -- Hunt -- did not personally investigate any of the bases for termination. Rather, she relied on information relayed to her by Warwick and Linkey. Hunt and Warwick did not provide Plaintiff the opportunity to explain the perceived shortcomings, nor did Defendant previously warn or discipline Plaintiff for her recordkeeping and appointment scheduling. Under these circumstances, where Plaintiff was terminated in the middle of her leave, without the opportunity to explain perceived errors that were in full view of her immediate supervisor for several months, this Court finds there are disputed issues as to whether Defendant took reasonable steps to investigate the factual basis for the allegations before taking action. Therefore, the honest belief rule is inapplicable for summary judgment purposes, and Defendant's Motion is denied with respect to Plaintiff's FMLA retaliation claim.

### FMLA Interference

Plaintiff also brings an FMLA interference claim. The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the so-called "interference" or "entitlement" theory arising from Section 2615(a)(1); and (2) the "retaliation" or "discrimination" arising under Section 2615(a)(2). *Seeger*, 681 F.3d at 282.

The FMLA prohibits qualifying employers from "interfer[ing] with, restrain[ing], or deny[ing]" the exercise of a right under the FMLA. 29 U.S.C. § 2615(a)(1). Section 2614(a)(1)

states that "any eligible employee who takes leave . . . shall be entitled, on return from such leave (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." 29 U.S.C. § 2614(a)(1). To prevail on an FMLA interference claim, Plaintiff must establish: (1) she is an eligible employee; (2) Defendant is an FMLA-qualifying employer; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2008). Here, Plaintiff alleges Defendant interfered with her FMLA leave by not allowing her to be restored to her prior position by virtue of her termination. Defendant argues she was not entitled to the benefit of being restored to HSC position because of her poor performance.

As discussed in the section above addressing Plaintiff's FMLA retaliation claim, there are disputed issues of material fact that preclude summary judgment on this claim as well.

**Sex (Pregnancy) Discrimination**

Federal and state pregnancy discrimination claims generally are evaluated generally under the same substantive standards. *See Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 471–72 (6th Cir. 2005). Under the Pregnancy Discrimination Act provisions of Title VII, discrimination because of or on the basis of pregnancy, childbirth, or related medical conditions is defined as a kind of prohibited sex discrimination. 42 U.S.C. § 2000e(k). Women who are affected by pregnancy, childbirth, or related medical conditions are required to be treated the same, for all employment purposes, as other persons not so affected but who are similar in their ability or inability to work. *Id.* Plaintiff's claims are not premised on direct evidence of pregnancy-based discriminatory animus. Therefore, her claims are subject to analysis under the evidentiary framework established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–03 (1973). *Tysinger v. Police Dep't of City of*

11

*Zanesville*, 463 F.3d 569, 572–73 (6th Cir. 2006). To sustain her claims, she must establish a prima facie case by showing that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Id.* at 573 (internal quotation marks and citation omitted). A plaintiff can satisfy the nexus requirement by offering evidence demonstrating comparable non-pregnant employees received more favorable treatment. *Id.*

Plaintiff fails to establish the nexus requirement. In fact, Plaintiff was replaced by a female who had previously taken two periods of maternity leave and received promotions after returning from each leave period (Linkey Dep. at 14). Plaintiff has not provided an example of a non-pregnant employee who was treated differently than Plaintiff. In fact, the vast majority of Defendant's employees are female, and many have taken maternity leave under the FMLA and were promoted thereafter (*see generally* Doc. 58). In addition, unlike Plaintiff's FMLA claims, in which the time period between her requesting FMLA leave and her termination was a few weeks, Defendant knew Plaintiff was pregnant for nearly nine months before it decided to terminate her employment. Based on this Court's analysis of existing Sixth Circuit case law, the temporal relationship between Defendant's knowledge of Plaintiff's pregnancy and the adverse employment action is an insufficient nexus. *See DiCarlo*, 358 F.3d at 421.

Thus, the Court finds that Plaintiff has failed to meet her prima facie burden with respect to her pregnancy discrimination claim under the Title VII and Ohio law. Accordingly, this Court grants Defendant's Motion for Summary Judgment with respect to Plaintiff's federal and state sex (pregnancy) discrimination claims.

**CONCLUSION**

For the above reasons, Defendant's Motion for Summary Judgment (Doc. 48) is granted with respect to Plaintiff's federal and state sex (pregnancy) discrimination claims and is denied with respect to her FMLA retaliation and interference claims.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

April 30, 2014